UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NUMBER: 15-091 |
| ROBERT DURST | SECTION C (1) |

ORDER and REASONS

Before this Court is Robert Durst's Motion to Suppress filed on June 4, 2015. Rec. Doc. 52. Mr. Durst seeks to suppress evidence from: (1) his arrest; (2) the subsequent interrogation; (3) the warrantless search of his hotel room; and (4) the subsequent execution of a search warrant of the same hotel room. The government has filed an opposition on September 4, 2015. Rec. Doc. 115. Mr. Durst was granted leave to file a reply which he did on September 16, 2015. Rec. Doc. 129. The Court issued an order for supplemental briefing regarding the issue of whether an evidentiary hearing was warranted. Rec. Doc. 124. Mr. Durst and the government each filed a memorandum on the issue. Rec. Docs. 126 and 127. After reviewing the extensive pleadings and exhibits submitted, including the requested supplemental memoranda, the court finds that the Motion to Suppress can be resolved without an evidentiary hearing. For the following reasons, the motion is DENIED.

## I. Background

Defendant, Robert Durst is currently under indictment for allegedly violating 18 U.S.C. §922(g)(1) and 924(a)(2), for being a felon in possession of a firearm. Rec. Doc. 9. The indictment stems from events occurring on March 14, 2015 at the J.W. Marriott Hotel in New Orleans. While at the hotel to execute a probable cause arrest warrant for Durst issued by California authorities, federal agents arrested Durst. Rec. Doc. 1. Los Angeles County authorities issued the warrant for Durst's arrest based on the affidavit of LAPD detective Luis A. Romero in regards to his

investigation for the murder of Susan Berman. Rec. Doc. 58. (Exhibit A) ("Romero Affidavit").

After inquiring with hotel staff and learning Durst was not registered under his name or one of his known aliases, FBI agents William C. Williams and Crystal Bender observed Durst in the lobby. Rec. Doc. 1 at 3. Although Durst would not verbally acknowledge his name to the agents, they identified themselves as special agents of the FBI. *Id.* Agent Williams then asked for identification, to which Durst advised that he had a passport in his room, but no identification on his person. *Id.* Agent Williams then asked what name Durst was registered under, to which Durst replied "Everette Ward." Agents Williams and Bender also inquired as to what room Durst was registered in, to which replied with his room number 2303. Rec. Doc. 132 at 8. Durst was then informed by Agent Williams that California authorities had issued a warrant for his arrest, and as the warrant was verified, Durst was instructed to sit and wait in the hotel lobby. *Id.*

Subsequently, the agents escorted Durst to his hotel room to inventory and itemize his belongings prior to bringing him to Orleans Parish Prison for booking. Rec. Doc. 1 at 4. The room key for room 2303 was obtained from Durst's person. *Id.* The agents then frisked Durst and he was placed in a hotel room chair with his left arm cuffed to a room table as the agents proceeded to photograph and inventory his belongings in the hotel room. *Id.* As Agent Williams proceeded to go through the personal belongings in the room, Durst informed him he had a jacket hanging in the closet which had a firearm in it. Recovered from the jacket was a Smith and Wesson .38 caliber revolver, loaded with four live rounds and one spent casing. *Id.*

During the course of the inventory, detectives with the Los Angeles Police Department ("LAPD") requested the federal agents cease the inventory and secure the hotel room as the LAPD detectives were en route to New Orleans to secure a search warrant. Rec. Doc. 1 at 6. LAPD detectives had been in Houston, Texas investigating their murder case against Durst but began driving to New Orleans. *Id.* A search warrant for the hotel room was issued by Criminal District

2

Court for the Parish of Orleans around 2:00 am on March 15, 2015. *Id.* at 6. The affidavit in support of the application for the warrant was from LAPD detective Michael Whelan. Rec. Doc. 58-4. The firearm that is the subject of the indictment before this Court, was the firearm recovered from Durst's hotel room. *Id.* at 4.

Durst filed the instant Motion to Suppress seeking to have evidence from: (1) his arrest; (2) the subsequent interrogation; (3) the warrantless search of his hotel room; and (4) the subsequent execution of a search warrant of the same hotel room suppressed. Rec. Doc. 52. Durst alleges various issues with the arrest warrant, particularly, that it lacked probable cause, the affidavit in support contained misrepresentations and omitted exculpatory information. Durst also argues that the questioning in the hotel lobby was in violation of *Miranda* and therefore requests the exclusion of any and all statements Durst made while in custody. Durst additionally seeks to have all physical evidence recovered from his hotel room suppressed due to the warrantless "inventory search" conducted by the FBI agents. Further, Durst contends that any evidence "discovered" during the second search conducted pursuant to a search warrant should be suppressed due to the invalidity of the search warrant and the taint from the preceding arrest, interrogation and warrantless search.

The government's opposition argues that the motion should be denied since: (1) Durst did not have a legitimate expectation of privacy in the hotel room; (2) the physical evidence is admissible under the independent source doctrine; (3) the room number evidence is admissible under the inevitable discovery doctrine; (4) suppression of physical evidence is not a remedy for a *Miranda* violation; (5) the search warrant established probable cause and was executed in good faith; (6) the defense failed to make the required preliminary showing under *Franks* to challenge the affidavit; (7) in the alternative, the arrest was valid under the collective knowledge doctrine, even if the arrest warrant was invalid; and (8) the inventory search was not invalid.

**II. Law and Analysis**

**A. Durst's Expectation of Privacy in His Hotel Room**

The government's first argument in opposition to the motion to suppress is that Durst did not have a legitimate expectation of privacy since he was in the room under false pretenses and therefore there is no reason under the Fourth Amendment to suppress the items found in Durst's hotel room. For there to be a legitimate expectation of privacy, (1) the defendant must have exhibited an actual, subjective expectation of privacy and (2) the defendant's subjective expectation of privacy is one that society is prepared to recognize as reasonable. *See Rakas v. Illinois,* 439 U.S. 128 (1978); *Smith v. Maryland*, 442 U.S. 735 (1979); and *Katz v. United States*, 389 U.S. 347 (1967).

Under New Orleans, La. Code § 54-487 (2015), the government argues, it is a criminal offense to register for a hotel room under false pretenses. Rec. Doc. 115 at 2. However, the actual language of this ordinance involves using false identification with law enforcement and does not appear applicable to the facts of this case. Durst registered for his hotel room under the alias "Everette Ward," however, he maintains he did not use any physical identification to do so. Rec. Doc. 129-1.

The government cites to *Rakas v. Illinois,* where the Supreme Court used the example of a "burglar plying his trade in a summer cabin during the off season." *Rakas*, 439 U.S. at 143 n.12. Since the burglar's "presence... is 'wrongful,' his expectation of privacy is not one that society is prepared to recognize as 'reasonable.'" *Id.* The government also cites to the Ninth Circuit case *United States v. Cunag* which held that a defendant who used false information, including forged documents to rent a hotel room, did not have a legitimate expectation of privacy in that hotel room. "When an individual is not legitimately on the premises he does not enjoy the protection afforded by the Fourth Amendment." *United States v. Cunag,* 3869 F.3d 888, 893 (9th Cir. 2004). However, the defense argues that the government's reliance on *Cunag* is misplaced since Cunag was actually locked out of the hotel room by hotel management, after discovering his fraud, before the police

4

were notified. *Cunag* 368 F.3d at 890. It was the hotel management's "affirmative steps to repossess the room" that extinguished the defendant's Fourth Amendment expectation of privacy, not his use of an alias. *Id.* at 895. Thus, the defense sees this case as supporting their contention that Durst has standing to challenge the two searches of his hotel room.

Durst cites to a Georgia case, which in turn relied on cases from the Eleventh and Eighth circuits, for the holding that an individual has a legitimate expectation of privacy in a hotel room registered for with an alias where he had exclusive control over the room and key. *United States v. Henry*, 939 F.Supp.2d 1279 (N.D. Ga. 2013), relying on *United States v. Newbern*, 731 F.2d 744 (11th Cir. 1984); and *United States v. Watson*, 950 F.2d 505 (8th Cir. 1991). In his affidavit, Durst maintains that he had exclusive control over the room and key. Rec. Doc. 129-1.

Although there is no Fifth Circuit authority on point, this Court is not about to disrupt the long standing Fourth Amendment protection afforded hotel rooms as temporary homes by declaring that the use of an alias negates any privacy interest in that room. To do so would call into question the privacy expected from numerous dignitaries, politicians and celebrities who rely on using an alias to register for hotel rooms in order to maintain their security and privacy. Durst had paid for the hotel room through March 17, 2015 and had exclusive control over the room and key. He did not obtain the room through fraud as in *Cunag* and was not prevented from using the room by hotel management prior to law enforcement involvement. He had a legitimate expectation of privacy in that room, and therefore has standing to bring his current claims for suppression.

**B. Applicability of the Independent Source Doctrine**

The government cites to the unreported Fifth Circuit case *United States v. Bryan,* for its holding that because the independent source doctrine may be dispositive, the court should address it before considering the legality of a warrantless initial search. 275 F.3d 1081 (5th Cir. 2001). The government argues there is no reason to suppress the items found in the hotel room since the search

5

warrant was untainted by the prior search and the items would have been found even without the initial warrantless search. The Court agrees that the issue of whether the independent source doctrine applies is dispositive and will therefore address is first.

Under *Murray v. United States*, evidence obtained pursuant to an independently obtained search warrant is admissible despite the fact that the evidence had been observed during a prior illegal search. 437 U.S. 533, 541 (1988). The applicable analysis is two part: (1) Does the warrant affidavit, when purged of tainted information gathered during the initial illegal entry, contain enough remaining facts to constitute probable cause? and (2) Did the illegal search affect or motivate the officers' decision to procure the search warrant? *United States v. Restrepo*, 966 F.2d 964 (5th Cir. 1992). When analyzing whether the warrant was tainted by the prior search, the question is not whether the warrant sought items found in the initial search, but rather whether the fruits of the initial search were relied on to support probable cause. *United States v. Hearn*, 563 F.3d 95 (5th Cir. 2009).

### 1. Prong One: Does the Warrant Affidavit, When Purged of Tainted Information Gathered During the Initial Illegal Entry, Contain Enough Remaining Facts to Constitute Probable Cause?

The defense argues that the government cannot meet its burden to show that the search warrant provided a completely independent source of the evidence. The defense contends the only source for the room number, the name he checked in under, the type and location of his car and the likelihood of a firearm being present in the room was the prior arrest, interrogation and warrantless search. Since all this occurred prior to the search warrant application, Durst argues there would have been no location to search and no legal basis to search Room 2303. When this information is purged from the warrant application, the defense argues there are no facts left to establish probable cause that Durst was in Room 2303 or that room 2303 would contain a handgun.

The government contends that the seizure of the firearm from Mr. Durst's room was "wholly

independent" of any prior, warrantless search of the room since the affidavit submitted in support of the search warrant did not mention any information regarding the FBI's previous entry and inventory of the hotel room. Instead, the government argues, there was enough independent information to establish probable cause, including: (1) 20 paragraphs detailing why Durst was suspected of killing Susan Berman; (2) information regarding Durst's previous flight from justice and his means to carry it out again; (3) the recent national media attention from the HBO documentary; (4) the information gleaned from the wiretap that indicated Durst was staying at the JW Marriott Hotel in New Orleans; (5) the observation of Durst in the lobby of the hotel; (6) Durst's statements that he was checked in under the alias "Everette Ward" and had identification in his hotel room; and (7) an explanation by the affiant as to why he believed a search of the hotel room would provide evidence of Durst's whereabouts and evidence of fleeing his primary residence in order to avoid arrest and prosecution. Further, the government points to the fact that the affidavit in support of the search warrant was "virtually identical" to the arrest warrant affidavit, prepared three days prior, in order to show that probable cause did not rely on the fruits of the warrantless search.

While the defense urges the fact that the affidavit in support of the search warrant makes no mention of the prior warrantless search as evidence of deliberately misleading the magistrate, this fact actually weighs in favor of the independent nature of the subsequent search. *United States v. Grosenheider*, 200 F.3d 321, 327 (5 Cir. 2000) (independent source exception applies when evidence viewed from the illegal entry was never mentioned to the judge issuing the warrant.). By not mentioning anything that was seen during the warrantless search, the officers were protecting the independent nature of the search warrant. Based on the affidavit submitted in support of the search warrant, there was enough information for the magistrate to find probable cause.

In addition to the probable cause statements in the affidavit in support of the search warrant cited by the government, there are additional facts that support the finding of probable cause. Law

7

enforcement was on notice that Durst was about to repeat his previous behavior of attempting to flee a prosecution by leaving the country, and "going off the radar." Rec. Doc. 115 at 29. When combined with the fact that additional publicity and attention from the HBO series *The Jinx*[1] focused on Durst's connection to Susan Berman's murder, the nexus is provided between his hotel room in New Orleans and the probability of him taking incriminating evidence with him and the possibility of finding it in his hotel room in New Orleans.

### 2. Prong Two: Did the Illegal Search Affect or Motivate the Officers' Decision to Procure the Search Warrant?

As for the second prong, the defense argues the government would not be able to establish the illegal search did not motivate or affect the decision to seek a search warrant. Durst places a lot of emphasis on the fact that the handgun was the first item listed as being sought by the search warrant and argues it shows that the FBI's discovery of the handgun was the primary motivating factor for seeking a search warrant. Secondly, Durst argues that the application is silent as to the prior illegal search reveals the government's awareness that the FBI's search was problematic.

The government maintains that the decision to obtain the search warrant was not motivated by the prior warrantless search. In response to the defense's chart which supposedly shows how the prior illegal search tainted the search warrant, the government contends the language used in the search warrant was "boilerplate used in warrants concomitant with gun crimes," and is a standard request in search warrants. Rec. Doc. 115 at 16. Similar language was also used in the Texas search warrant for Durst's residences there. *Id.* Further, the items sought by the warrant are "routine things that would naturally be sought in any warrant regarding a murder suspect likely on the run." *Id.* The government also points out that Durst did not mention the items requested in the warrant that were

---

[1] As an aside, the Court has not seen this series and any information regarding the series has been gleaned from the pleadings in this case.

**not** found in the hotel room (i.e. newspaper clippings) and things that were not sought by the warrant but **were** found in the hotel room (i.e. face mask, maps, marijuana, prescription drugs).

The question of illegal motivation is a subjective one and thus, depends on Detective Whelan's statements and testimony. Detective Whelan's affidavit was submitted to the Court and it shows that his department was already planning on obtaining a search warrant for whatever location where Durst was located and whatever personal property he had with him when found. Rec. Doc. 132 at 1. Further, the affidavit submitted in support of the California wiretap of Durst's phone two days before Durst's arrest affirms that LAPD intended to serve search warrants at residences identified as belonging to Durst. Rec. Doc. 132 at 12. It is the finding of this Court that the illegal search did not motivate the officer's decision to secure a search warrant for Durst's hotel room.

The evidence obtained during the initial warrantless search by the FBI was arguably tainted since warrantless searches are presumptively unreasonable. However, the second seizure of the evidence during the legal search pursuant to a search warrant removes any taint from the original seizure. *See Grosenheider*, 200 F.3d at 330 n.10; and *Murray* 487, U.S. at 342. The physical evidence seized during the search is admissible under the independent source doctrine. There is no need to further analyze the first warrantless search nor the search warrant.

### C. Arrest and Arrest Warrant

#### 1. Arrest Warrant Not Supported by Probable Cause

Durst argues that the information in the affidavit in support of the arrest warrant application was known to the Los Angeles Police for at least 10 years. According to the defense, the "crucial" piece of information for the magistrate's probable cause determination was the "cadaver" note. The "cadaver" note was an anonymous note sent to the Los Angeles Police the day before Susan Berman's body was discovered at her home in Beverly Hills, but arrived after the body was discovered - thus it could only have been written by the killer. The warrant application relied on two

handwriting comparisons that named Durst as the author of the "cadaver" note. Durst argues that regardless of the other issues discussed below, the arrest warrant still failed to state probable cause as written because two handwriting analysis opinions are not enough to base probable cause on since handwriting comparisons are an unreliable art. However, Durst's motion never explains under what legal authority the remedy for a defective arrest warrant is the exclusion and suppression of physical evidence obtained via a valid search warrant.

The government contends that Durst's attack on the arrest warrant is an attempt to begin litigating the California murder charge and receive discovery he is not yet entitled and this Court has to agree. The FBI agents were notified of a validly issued arrest warrant from California and acted in good faith upon that warrant by arresting Durst in New Orleans. The validity of the arrest warrant does not have a bearing on the validity of the search warrant and the evidence seized pursuant to it.

## 2. Omissions and Misrepresentations in Affidavit to Secure Arrest Warrant

The defense argues it is entitled to a *Franks* hearing in order to show the underlying affidavit for the arrest warrant was deliberately misleading. Under the defense's argument, for the magistrate to find probable cause, he would have had to believe that the author of the cadaver note was Susan Berman's murderer based on his acceptance of the two handwriting comparisons. Handwriting comparison is, the defense argues, too subjective to be given such weight. Further, the defense argues that the affidavit in support of the arrest warrant omitted a previous handwriting comparison which named another suspect in the case as the "highly probable" writer. This individual (Nyle Brenner) had also failed a polygraph test regarding Susan Berman's murder, and while he was a suspect in the first few months of the investigation, the LAPD no longer consider him a suspect. According to the defense, the omission of this information from the application for the warrant is the reason the magistrate was able to find probable cause. If it had been included, the defense avers

that the magistrate would not have found probable cause.

Additionally, Durst argues that the affidavit in support of the arrest warrant contained factual misrepresentations. Specifically, Detective Romero's affidavit in support of the arrest warrant characterized one handwriting comparison opinion as "highly probable" that Durst was the author, when in actuality the opinion was only "probable." The defense argues that Detective Romero also misrepresented Durst's testimony from a 2003 trial: while including the portion where Durst admitted to being in California during the time of Susan Berman's murder, Detective Romero failed to include the subsequent portion of the testimony where Durst explained he was in San Francisco, about 400 miles away from Los Angeles where Susan Berman was murdered. The defense argues if the material misrepresentations are corrected and the omitted information included, the magistrate judge would not have found probable cause to issue the arrest warrant.

To obtain an evidentiary hearing based on *Franks* the defendant must make a "substantial preliminary showing" that (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in the warrant affidavit, and (2) the remaining portion of the affidavit is insufficient to support a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Fifth Circuit case law states that "analytical concepts of materiality and recklessness are often bound together," thus, where a misrepresentation is "a crucially material one," the Court may "conclude that the misrepresentation was made, at the least, with reckless disregard for the truth." *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982).

In the Fifth Circuit, omissions in a supporting affidavit can also trigger the *Franks* standard. *United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995). The required showing for an omission is: (1) the affiant made the omission intentionally and/or with reckless disregard for the omission's tendency to mislead and (2) there would not have been probable cause if the affiant had included

11

the omitted material in the affidavit. *United States v. Cleveland*, 964 F.Supp 1073, 1077 (E.D. La. 1997). If the facts omitted are "clearly critical" to a finding of probable cause, affiant's recklessness may be inferred. *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980).

The government argues that Durst's accusation that Detective Romero was deceptive in his affidavit by characterizing a handwriting comparison as "highly probable" instead of "probable" is "a truncated factual distortion." Rec. Doc. 115 at 39. The government characterizes this as only a "mis-description" that was a result of the history behind the numerous handwriting comparisons done over the course of the murder investigation that had ruled out a prior suspect and concluded that Durst was the writer of the "cadaver" note. Further, the affidavit mentioned other comparisons so this mis-description was not the only piece of information that the finding of probable cause hinged on. In addition, the government points out that the information regarding Brenner was omitted and had no effect on probable cause since he had been eliminated as a suspect over fourteen years ago.

In addition, Durst's attempts to categorize Detective Romero's description of Durst's location in California as another misrepresentation is a stretch. Romero's affidavit stated Durst was in California at the relevant time, not that he was in Los Angeles. It is highly unbelievable that this statement was enough to convince a magistrate that Durst was conclusively in the Los Angeles area without more information.

According to the Supreme Court, a warrant should not be invalidated by interpreting an affidavit in a hyper-technical, rather than a commonsense, manner. *United States v. Ventresca*, 380 U.S. 102, 108-109 (1965). This Court agrees that this mis-description was not a deliberate attempt to mislead the magistrate and even if removed, there is still ample other evidence for the magistrate to find probable cause. The Texas search warrant application contained the same information

regarding Brenner that Durst contends was deliberately omitted and the Texas magistrate still found probable cause to issue the search warrant for Durst's Houston home. Thus the alleged deliberate misrepresentations and omissions had no bearing on a finding of probable cause. The defense has failed to make the requisite preliminary showing to warrant a *Franks* hearing.

### D. Statements Made in Hotel Lobby by Durst

Durst's attorneys argue that the FBI's failure to provide Durst with the required *Miranda* warnings before questioning him in the hotel lobby requires the exclusion of any and all statements he made while in custody. As a result of not providing Durst with the required *Miranda* warning, the defense requests that the Court suppress any and all statements made during this interrogation since the use of these statements whether as evidence at trial or to justify a warrant, would violate Durst's Fifth Amendment rights. The government maintains there was no *Miranda* violation. However, the government contends that even if a *Miranda* violation occurred, suppression of physical evidence is not the proper remedy.

The defense argues Durst was in custody once FBI agent Williams informed him there was a warrant for his arrest and told him to sit down in the lobby. Durst argues that at this point he was under arrest since his freedom of movement had been restrained. Durst maintains it was at this point that the "interrogation" began with the FBI agents questioning him regarding the location of his hotel room, whether he had belongings or money in the room, his method of transportation to the hotel including the circumstances surrounding his use of a car not registered to him, and what name he used to check in to the hotel.

First, the government argues Durst was not under arrest or its functional equivalent when he provided the alias he used to check-in under. It is the government's contention that the FBI agents approached him in the hotel lobby, identified themselves and asked for his name and what room he checked in under. There was no restraint on Durst's freedom to move and the agents had

13

not informed him of the arrest warrant yet. Second, the government contends that any additional statements Durst made were not the product of an interrogation and therefore did not trigger *Miranda.* All questions that the FBI asked were, as the government argues, for the purpose of confirming Durst's identity.

Under *Miranda*, a suspect must be in "custodial interrogation" for the rights to apply. *Miranda*, 384 U.S. 436, 482 (1966). Custody, for purposes of *Miranda* is defined as "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). An interrogation is defined for *Miranda* purposes as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). An interrogation can also include "any words or actions on the part of the police... that the police should know are reasonable likely to elicit an incriminating response from the suspect." *Id.* at 301. The exception is for words and actions normally attendant to arrest and custody. *Id.* Thus, routine, generic questions for identification purposes are not calculated to elicit incriminating responses and therefore do not trigger *Miranda*. *Id.*

From the moment that the FBI agents identified themselves and asked Durst to remain in the lobby with them, Durst was effectively within custody for purposes of *Miranda.* The questions posed by Agent Williams were: (1) whether Durst had identification on his person; (2) what name Durst was registered with the hotel under; and (3) what was the room number for Durst's hotel room. The questions are clearly a "routine, generic question for identification purposes" and therefore do not constitute an interrogation for *Miranda* purposes. The FBI agents were trying to confirm Durst's identity in order to execute an arrest warrant. They had previously learned that no hotel guest was registered under Durst's name or one of his known aliases. However, even if the second two

14

questions were to be in violation of *Miranda*, the alias "Everette Ward" and the room number Durst was staying in would have been inevitably discovered since the hotel manager saw Durst with the FBI agents and remembered Durst checking in and could have then checked the hotel records for the agents. Rec. Doc. 132 at 8.

The defense argues that a violation of *Miranda* warrants a suppression of any physical evidence obtained as a result of those statements. However, physical evidence obtained as a result of voluntarily made un-*Mirandized* statements is still admissible. *See United States v. Patane*, 542 U.S. 630 (2004); *Oregon v. Elstad*, 470, U.S. 298 (1985). The proper remedy for a *Miranda* violation is to exclude the un-warned statement from trial. *Patane*, 542 U.S. at 642 (citing *Chavez v. Martinez*, 538 U.S. 760, 790 (2003).). While in this Court's opinion there was no *Miranda* violation, even if there had been one, the suppression of the physical evidence is not the proper remedy.

### III. Conclusion

Durst has standing to challenge the warrantless search of his hotel room. However, the search warrant provided an untainted, independent source of the physical evidence. The arrest warrant was probably supported by probable cause and executed in good faith by the FBI agents in New Orleans. Durst has not made the requisite preliminary showing for a *Franks* hearing and therefore cannot challenge the affidavit in support of the arrest warrant. Finally, the statements made by Durst in the hotel lobby were unquestioningly made while "in custody" however, they were not designed to elicit incriminating information and thus do not warrant a *Miranda* warning. However, even if they were, the information gleaned from those questions, the alias and room number would have been inevitably discovered through further questioning with hotel staff. There is no legal basis to order the suppression of any of the physical evidence and the motion to suppress is denied.

Accordingly,

IT IS ORDERED that the motion to suppress filed by the defendant Robert Durst is DENIED. Rec. Doc. 52.

New Orleans, Louisiana, this 6th day of October, 2015.

                                                            **HELEN G. BERRIGAN**
                                                            **UNITED STATES DISTRICT JUDGE**